NO. 12-02-00117-CV



IN THE COURT OF APPEALS
 


TWELFTH COURT OF APPEALS DISTRICT



TYLER, TEXAS


IN THE INTEREST
§
 APPEAL FROM THE 349TH


§
 JUDICIAL DISTRICT COURT OF

OF J.R.W., A CHILD

§
 ANDERSON COUNTY, TEXAS

 

MEMORANDUM OPINION


 Appellant Alvin Westley ("Alvin") appeals the termination of his parental rights. In two
issues, Alvin argues the trial court erred by finding that termination is in the best interest of the child. 
We affirm.


Background

 Christi Pugh ("Christi") and Alvin were married on July 12, 1992. J.R.W., their son and the
subject of this suit, was born on February 10, 1993. On June 1, 1995, Alvin pleaded nolo contendere
to three counts of indecency with a child committed in 1993. Alvin was sentenced to ten years of
deferred adjudication probation, a $1,500 fine, and 240 hours of community service. (1) Additionally,
Alvin was ordered to submit to drug urinalysis testing and, as a condition of his probation, attend sex
offender counseling. However, on August 30, 1996, Alvin was jailed for probation violations. On
November 27, 1996, Alvin's probation was revoked. As grounds for revocation, the State alleged that
Alvin violated the terms of his probation by sexually molesting a child under the age of fourteen. 
There were allegations of six separate incidents against the child in June and August of 1996. Further,
the State alleged Alvin had unsupervised contact with a person under the age of seventeen, namely the
same child he allegedly molested, during three weeks in June and August of 1996. There is no
evidence in the record that these allegations were ever adjudicated. Although Alvin, at one point,
acknowledged the court found these allegations true, he also stated that the court simply found the
allegations "reasonable enough to adjudicate me." The court sentenced Alvin to imprisonment for
seventeen years. (2) Alvin has been in continuous custody since August 30, 1996 and, according to his
testimony, has a mandatory release date of October 15, 2003.

 Approximately one year after Alvin's incarceration, Christi filed for divorce. The divorce was
final in April of 1998. Alvin testified that he was appointed possessory conservator of J.R.W. with
no restrictions placed on his visitation rights. Christi testified that she and Alvin were appointed joint
managing conservators of J.R.W., but she was appointed primary conservator. Alvin was ordered to
pay child support. However, Alvin testified that the divorce decree stated he was unable to pay child
support because he had no income or resources. On June 5, 1998, Christi married Jerry Pugh ("Jerry"),
and J.R.W. has resided with them since that date. The couple has a four-year-old daughter who also
resides with them.

 On July 5, 2001, Christi and Jerry filed a petition for termination and adoption, requesting that
Alvin's parental rights be terminated and that Jerry be permitted to adopt J.R.W. Alvin answered and
appeared for trial pursuant to a bench warrant. Additionally, the court ordered Charlotte Moore
("Moore") to prepare a social study regarding J.R.W.'s circumstances and condition and assessing
Christi and Jerry's home. The termination proceeding was tried before the court. After examining and
hearing all of the evidence, the judge found by clear and convincing evidence that Alvin "knowingly
engaged in criminal conduct (indecency with a child-three counts) that resulted in his conviction of
offenses and confinement or imprisonment and inability to care for the child for not less than two years
from the date the Petition was filed." He also found that termination of the parent-child relationship
between Alvin and J.R.W. was in the best interest of the child. On March 23, 2002, the court signed
an order terminating the parent-child relationship between Alvin and J.R.W. and granting Jerry's
adoption of J.R.W. Alvin appeals the termination of his parental rights and contends that the evidence
is legally and factually insufficient to support the trial court's finding that termination is in the best
interest of the child.


Termination of Parental Rights Involuntary termination of parental rights embodies fundamental constitutional rights. Vela v.
Marywood, 17 S.W.3d 750, 759 (Tex. App.-Austin 2000), pet. denied per curiam, 53 S.W.3d 684
(Tex. 2001); In re J.J., 911 S.W.2d 437, 439 (Tex. App.-Texarkana 1995, writ denied). A
termination decree is "complete, final, irrevocable [and] divests for all time the parent and child of all
legal rights, privileges, duties, and powers with respect to each other except for the child's right to
inherit." Wiley v. Spratlan, 543 S.W.2d 349, 352 (Tex. 1976); In re Shaw, 966 S.W.2d 174, 179
(Tex. App.-El Paso 1998, no pet.). Thus, breaking the bonds between a parent and child "can never
be justified without the most solid and substantial reasons." Wiley, 543 S.W.2d at 352. Because a
termination action permanently sunders those bonds, the proceedings must be strictly scrutinized. Id.;
In re Shaw, 966 S.W.2d at 179. However, parental rights are not absolute, and it is vital that the
emotional and physical interests of the child not be sacrificed in preserving those rights. In re C.H.,
89 S.W.3d 17, 26 (Tex. 2002).

 Section 161.001 of the Family Code permits a court to order termination of parental rights if
two elements are established. Tex. Fam. Code Ann. § 161.001 (Vernon 2002); In re J.M.T., 39
S.W.3d 234, 237 (Tex. App.-Waco 1999, no pet.), disapproved on other grounds, In re J.F.C., 96
S.W.3d 256, 267 n.39 (Tex. 2002). First, the parent must have engaged in any one of the acts or
omissions itemized in the first subsection of the statute. Tex. Fam. Code Ann. § 161.001(1) (Vernon
2002); Green v. Texas Dep't of Protective & Regulatory Servs., 25 S.W.3d 213, 219 (Tex. App.-El
Paso 2000, no pet.); In re J.M.T., 39 S.W.3d at 237. Second, termination must be in the best interest
of the child. Tex. Fam. Code Ann. § 161.001(2) (Vernon 2002); In re J.M.T., 39 S.W.3d at 237. 
Additionally, both elements must be established by clear and convincing evidence, and proof of one
element does not alleviate the petitioner's burden of proving the other. Tex. Fam. Code Ann. §
161.001 (Vernon 2002); Wiley, 543 S.W.2d at 351; In re J.M.T., 39 S.W.3d at 237. 

 Due process requires a petitioner to justify termination by clear and convincing evidence
because termination is such a drastic remedy. In re J.M.T., 39 S.W.3d at 237. The clear and
convincing standard for termination of parental rights is both constitutionally and statutorily mandated. 
Tex. Fam. Code Ann. § 161.001 (Vernon 2002); In re J.J., 911 S.W.2d at 439. Clear and convincing
evidence means "the measure or degree of proof that will produce in the mind of the trier of fact a firm
belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann.
§ 101.007 (Vernon 2002). There is a strong presumption that the best interest of the child is served
by preserving the parent-child relationship. Wiley, 543 S.W.2d at 352; In re J.M.T., 39 S.W.3d at
240. Thus, the burden of proof is upon the person seeking to deprive the parent of their parental rights. 
In re J.M.T., 39 S.W.3d at 240.


Standard of Review

 When confronted by both a legal and factual sufficiency challenge, an appellate court must first
review the legal sufficiency of the evidence. Glover v. Texas Gen. Indem. Co., 619 S.W.2d 400, 401
(Tex. 1981); In re M.D.S., 1 S.W.3d 190, 197 (Tex. App.-Amarillo 1999, no pet.). Because
termination findings must be based on clear and convincing evidence, the standard of review is not the
same on appeal as a finding based upon a preponderance of the evidence. In re J.F.C., 96 S.W.3d at
264. Therefore, in reviewing the legal sufficiency of the evidence to support termination findings, an
appellate court should look at all the evidence in the light most favorable to the finding to determine
whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was
true. Id. at 266. In order that proper deference is shown to the fact finder's role, an appellate court
must presume that the fact finder settled disputed facts in favor of its finding if a reasonable fact finder
could do so and disregard all evidence that a reasonable fact finder could have disbelieved or found
incredible. Id. However, a reviewing court is not required to ignore all evidence not supporting the
finding because that might bias a clear and convincing analysis. Id.

 The appropriate standard for reviewing a factual sufficiency challenge to the termination
findings is whether the evidence is such that a fact finder could reasonably form a firm belief or
conviction about the truth of the petitioner's allegations. In re C.H., 89 S.W.3d at 25. In determining
whether the fact finder has met this standard, an appellate court considers all the evidence in the
record, both that in support of and contrary to the trial court's findings. See id. at 28. Further, an
appellate court should consider whether disputed evidence is such that a reasonable fact finder could
not have reconciled that disputed evidence in favor of its finding. In re J.F.C., 96 S.W.3d at 266. If
the disputed evidence is so significant that a fact finder could not reasonably have formed a firm belief
or conviction, then the evidence is factually insufficient. Id. An appellate court should specify its
reasons for concluding that a reasonable trier of fact could not have resolved disputed evidence in
favor of the finding. Id. at 266-67.

 This standard retains the deference an appellate court must have for the fact finder's role. In
re C.H., 89 S.W.3d at 26. Additionally, the trier of fact is the exclusive judge of the credibility of the
witnesses and the weight to be given their testimony. Nordstrom v. Nordstrom, 965 S.W.2d 575, 580
(Tex. App.-Houston [1st Dist.] 1997, pet. denied). Thus, our review must not be so rigorous that only
fact findings established beyond a reasonable doubt could withstand review. In re C.H., 89 S.W.3d
at 26. Additionally, where, as here, no findings of fact or conclusions of law were requested or filed,
it is implied that the trier of fact made all the findings necessary to support its judgment. Worford v.
Stamper, 801 S.W.2d 108, 109 (Tex. 1990); In re T.J.S., 71 S.W.3d 452, 459 (Tex. App.-Waco 2002,
pet. denied).


Best Interest of the Child

 Alvin does not dispute the trial court's finding that he committed one of the predicate acts
necessary to permit termination of his parental rights. (3) We therefore turn to the trial court's finding
that termination is in the best interest of the child. In determining the best interest of the child, a
number of factors have been considered including (1) the desires of the child; (2) the emotional and
physical needs of the child now and in the future; (3) the emotional and physical danger to the child
now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs
available to assist these individuals; (6) the plans for the child by these individuals; (7) the stability
of the home; (8) the acts or omissions of the parent which may indicate that the existing parent-child
relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. Holley v.
Adams, 544 S.W.2d 367, 371-72 (Tex. 1976).

 This list is not exhaustive, but simply indicates considerations which have been or could be
pertinent. Id. However, the best interest of the child does not require proof of any unique set of
factors nor limit proof to any specific factors. In re D.M., 58 S.W.3d 801, 814 (Tex. App.-Fort Worth
2001, no pet.). The Holley test focuses on the best interest of the child, not the parent's best interest. 
Dupree v. Texas Dep't of Protective & Regulatory Servs., 907 S.W.2d 81, 86 (Tex. App.-Dallas
1995, no writ). Additionally, a stepparent's desire for adoption is another consideration in determining
the best interest of a child. In re J.M.T., 39 S.W.3d at 243. While incarceration is a factor in
determining the best interest of a child, it is not dispositive. In re C.T.E., 95 S.W.3d 462, 466 (Tex.
App.-Houston [1st Dist.] 2002, no pet.). In determining the weight of this factor, the court should
consider the expected length of an appellant's imprisonment and whether it can be inferred from an
appellant's criminal conduct that he has endangered the safety of the child. Id.


Legal Sufficiency of the Evidence

 In his first issue, Alvin argues that his conviction and sentence, allegations that he was not
there as a father, and the good relationship that Christi and Jerry have with J.R.W. provide the only
support for the trial court's finding. Therefore, he contends, the evidence is legally insufficient to
support the trial court's finding. We use the Holley factors as a guide in conducting our review.

The desires of the child

 J.R.W. did not testify. However, Christi testified that, from her observations, J.R.W. appears
to enjoy his relationship with Jerry. In her report, Moore wrote that J.R.W. "was quick to tell me he
wants to be adopted by his daddy (Jerry Pugh)."

The emotional and physical needs of the child now and in the future

 Christi testified that J.R.W.'s physical and emotional needs are being met in her current
marriage. J.R.W. takes Ritalin because he has ADD (Attention Deficit Disorder). Jerry testified that
he and Christi are able to meet J.R.W.'s emotional needs and believed that they are doing a good job. 
Further, Jerry testified that no one in Alvin's family has contacted him to help provide financial
support for J.R.W., but admits he does not know if Alvin asked his family to help support the child. 
Alvin does not have a relationship with J.R.W. and has no resources to contribute to J.R.W.'s support. 
Alvin did not specifically address J.R.W.'s future needs or his plans for meeting those needs.

The emotional and physical danger to the child now and in the future

 Initially, Alvin pleaded nolo contendere to three counts of indecency with a child committed
in 1993, and was assessed punishment at ten years of deferred adjudication. Approximately three years
later, Alvin's parole was revoked after the State alleged he had violated the terms of his probation. 
The State alleged that he sexually molested a child under the age of fourteen, and had unsupervised
contact with a person under the age of seventeen. The allegations described six separate incidents of
molestation over two months, and unsupervised contact for three separate weeks over the same two-month period.

 Christi believes Alvin is still a danger to J.R.W. despite his incarceration. Her greatest fear,
based on Alvin's conviction, is that something would happen to J.R.W. if he were to stay with Alvin.
However, Christi is not aware of any physical or emotional danger to J.R.W. in her current marriage. 
Alvin's mother, Kathleen Corbitt ("Kathleen"), testified that, if her husband had been incarcerated for
sexual molestation of children, she would allow visitation, but under supervision. Likewise, she
testified that it would be "okay" if Alvin's visits with his children were supervised.

The parental abilities of the individual seeking custody

 Christi testified that Jerry is a father-figure to J.R.W., participates in his school activities, and
treats J.R.W. like his own son. She stated that Jerry helps J.R.W. with his homework and goes hunting
and fishing with him. Jerry testified that he considers J.R.W. to be his own and does not show
partiality to his biological daughter. He stated that he and J.R.W. are very close and that he attends
to J.R.W.'s everyday school needs.

 Moore testified that Jerry and J.R.W. have had a father-son relationship for some time and that
the family interacts well together. Additionally, she testified that J.R.W. is disciplined properly. Two
of Jerry's friends testified that Jerry treats J.R.W. like a father would a son and no differently than he
treats his daughter. Further, one friend also testified that Jerry and J.R.W. interact well together and
have a very good relationship.

The programs available to assist the individual seeking custody

 In order to deal with his problems, Alvin testified that he has contacted Christian people willing
to help him with moral and physical support. Counseling is available at the prison eighteen months
before release. Also, he has contacted a "free world" counselor about continuing counseling.

The plans for the child

 There was no testimony regarding Jerry's plans for J.R.W. other than his desire to adopt J.R.W. 
Alvin testified that he plans to establish a relationship with J.R.W. when he is released from prison. 
He stated that he wants to tell J.R.W. what occurred and that it was wrong, and "to be the father that
I . . . was always intending to be." Further, Alvin testified that he wants to "get on with my life."

The stability of the home

 Christi testified that she believes J.R.W. has a stable home life which carries over to his school
life. She believes that she and Jerry are providing a good environment for J.R.W. Both Jerry and 
Christi are employed by the Texas Department of Criminal Justice ("TDC"). In her written report,
Moore stated that Jerry and Christi are buying their home, that it is in a rural location, and is neat and
clean. Additionally, Christi and Jerry have medical and life insurance through their employer.

The acts or omissions of Alvin Westley which may indicate that the existing parent-child

relationship is not a proper one and any excuse for the acts or omissions


 Alvin pleaded nolo contendere to three counts of indecency with a child committed in 1993
and was sentenced to deferred adjudication probation. His probation was revoked in 1996 for
allegations that he sexually molested a child under the age of fourteen and had unsupervised contact
with a person under the age of seventeen. He was sentenced to imprisonment for seventeen years and
has been incarcerated since August 30, 1996. Alvin will be released on or about October 15, 2003. 
Alvin testified that only two of the original three counts of indecency with a child occurred. Alvin
denied that he committed the acts alleged in the adjudication hearing. Further, Alvin testified that the
children he molested were older and not his own. He testified that he realized he committed a serious
offense and feels he has been punished for his crimes.

Additional evidence that termination is in the best interest of the child

 Christi testified that it was in J.R.W.'s best interest for Alvin's parental rights to be terminated
because, among other reasons, of the activity that caused him to be convicted of sexual molestation. 
In her report, Moore wrote that Jerry is the only father J.R.W. has ever known because he has had no
contact with Alvin since he was three years old. Moore testified that, in her opinion, J.R.W. needed
to remain in his present home and that it is in J.R.W.'s best interest for Alvin's parental rights to be
terminated based on Alvin's imprisonment and the nature of his crimes, and J.R.W.'s home,
background, and personality. Jerry testified that Alvin's parental rights should be terminated because
J.R.W. has a clean mind and they want him "to keep it that way." Alvin admitted that he does not
know his son's likes or dislikes or how he has been raised for the past five years.

Evidence that termination is not in the best interest of the child

 There is some undisputed evidence that does not support a finding that termination is in the
best interest of the child. Christi testified that there had never been improper behavior between Alvin
and J.R.W. Christi admitted that if Alvin's parental rights were not terminated, Jerry would continue
to be a father image to J.R.W. Alvin testified that, in his divorce from Christi in 1998, he was
appointed possessory conservator of J.R.W. with no restrictions placed on his visitation rights. Further,
although he was ordered to pay child support, the decree also noted that Alvin was unable to do so
because he had no income or resources. 

 Alvin testified that, while in prison, he has acquired all the good time he is entitled to earn, is
assigned to the utility squad, and works in the chaplain's office. Alvin has earned a computer science
degree from Alvin Community College while incarcerated. While he was in the Anderson County Jail
during the termination hearing, he was a trustie and worked for the sheriff. Estelle Nick, Alvin's
pastor, testified she has observed tremendous growth in Alvin during the past five years.

 Moore testified that she does not believe everyone incarcerated for Alvin's crime should have
their parental rights terminated. Further, she never contacted Alvin or his family because such actions
were not included in the court order. Jerry admitted he would not want his parental rights terminated
if he were incarcerated. 

 Viewing the evidence in a light most favorable to the finding, a reasonable fact finder could
have concluded that J.R.W. wanted to be adopted by Jerry, that Christi and Jerry were meeting all
J.R.W.'s physical and emotional needs, that their home was stable and provided a good environment
for J.R.W., and that Jerry was a suitable adoptive parent. Further, the court could have determined that
Alvin was a future danger to J.R.W. because of the nature of his crimes, sexual molestation of
children, and that he no longer had a relationship with J.R.W. Therefore, we conclude that the
evidence, viewed in the light most favorable to the finding, was sufficiently clear and convincing that
a reasonable trier of fact could have formed a firm belief or conviction that termination of Alvin's
parental rights was in J.R.W.'s best interest. Accordingly, Appellant's first issue is overruled.


Factual Sufficiency of the Evidence

 In his second issue, Alvin argues that the evidence is factually insufficient to support a finding
by clear and convincing evidence that termination was in the best interest of J.R.W. In addition to the
evidence reviewed above, evidence favorable to Alvin was presented. In conducting our review of this
evidence, we again use the Holley factors as a guide, disregarding those factors without disputed
evidence. See In re J.F.C., 96 S.W.3d at 266-67.

The parental abilities of the individual seeking custody

 Alvin's parental abilities were disputed. Alvin testified that he loves J.R.W. with "all [his]
heart" and that he wants to be a father. Before his incarceration, Alvin and J.R.W. had a great
relationship. He and J.R.W. went on weekend trips at least once a month. Alvin acknowledged that
he did not change a lot of diapers but did feed J.R.W. Prior to his incarceration, Alvin's two children
from a previous marriage resided with him, and he had full custody of them. Alvin regularly attended
church at Trinity Church in Palestine before being incarcerated and Christi and J.R.W. attended with
him.

 Additionally, Alvin's family testified regarding his parental abilities. His brother, James
Westley ("James"), believes Alvin was a good parent to J.R.W., that he interacted well with his
children, and was an involved and loving father. Alvin disciplined J.R.W. within proper bounds. His
mother, Kathleen, testified that she believes Alvin was a good father and parent, and that he and
J.R.W. had a good relationship. His sister, Susan Trim ("Susan"), testified that Alvin was an attentive
and loving father, and met J.R.W.'s day-to-day needs. Susan would describe Alvin as a good parent.

 However, Christi testified that Alvin was lying to the court regarding his relationship with his
son. Christi testified that Alvin was an absent father and did not pay attention to J.R.W. Christi stated
that Alvin may have spent one full day of quality time with J.R.W. throughout the years. Alvin did not
take care of J.R.W. and did not participate in any activities with him. If he did so, it was to put on a
show in front of people. Christi testified that Alvin never attended any school activities or paid
attention to his other children. Further, when she met with Alvin at the prison to serve him with
divorce papers, Alvin did not inquire about J.R.W.'s well-being, where he was, or why he had not
heard from J.R.W. Christi stated that Alvin attended church only sporadically after she decided not
to pursue a divorce action in 1994. She admitted that the family took a couple of trips together.

The acts or omissions of Alvin Westley which may indicate that the existing parent-child

relationship is not a proper one, and any excuse for those acts or omissions


 Alvin's lack of communication with J.R.W. since his incarceration and his excuse was also in
dispute. Alvin testified that he wrote a letter to J.R.W. approximately once a month, beginning with
his incarceration or approximately February of 1997. (4) Alvin explained that his letters were not
received by J.R.W. because Christi moved and did not leave a forwarding address. According to
Alvin, he was unable to locate Christi's address. At first, Alvin sent his letters to the post office box
address in Elkhart supplied by Christi. He also sent letters to the post office box address listed in the
divorce decree. Alvin testified that some of his letters were returned and, when letters were sent to
the address listed in the divorce decree, one or two were refused. However, Alvin also stated that only
one letter was refused in 1997 from Christi's address in the divorce decree. Additionally, one letter
was refused in 2001 from the same address. Alvin wrote a letter to the district clerk requesting
Christi's address, but did not receive a response. 

 Because his letters were being returned or refused, Alvin sent letters for J.R.W. to his mother's
address, hoping she would one day see J.R.W. He also sent birthday and Christmas cards to J.R.W.
in care of his mother, but these cards were never received by J.R.W. (5) Although Alvin knew Christi
was an officer at TDC, he testified that he was not allowed to contact an officer or get information
concerning an officer at TDC. Additionally, Alvin testified that if he had asked his brother, a justice
of the peace, to help him find an address for J.R.W., it would have been a misappropriation of his job.

 However, Christi does not believe Alvin wrote letters monthly as he claimed. Christi testified
that she did not receive any cards or letters from Alvin after he was adjudicated and sent to TDC. After
she left their residence in Elkhart, Alvin had her post office box address which was maintained for
approximately one year after his incarceration. Subsequently, she had a post office box address in
Tennessee Colony for two years. This is the address from which she refused a letter and is the address
that is listed in the divorce decree. Christi testified that she left forwarding addresses when she moved.

 After she filed for termination, Christi testified that Alvin wrote one letter to J.R.W. but she
refused it. She never refused a letter from Alvin in 1997. Christi testified that her position at TDC
was in the divorce papers, her name was in the telephone book, and Kathleen knew where she worked. 
She stated that there was never a time that Alvin did not have her address and that Alvin was not
truthful when he testified that he did not have her address. However, she was not aware that she was
supposed to give any address change to the district clerk. Jerry testified that his name was listed in the
telephone book, together with Christi's name. 

 Further, Christi stated that any offender can locate the social security number, name and
address of an officer at TDC. Jay Lively, a friend and former co-worker of Jerry's, testified that an
inmate can get an address for any officer in TDC from the writ room or law library. The law library
contains a list of all officers working for TDC with information from their employment application.

 Additionally, Alvin testified that Christi sent him a couple of letters and pictures that J.R.W.
made, but these contacts ceased after about a year. Alvin stated that Christi brought J.R.W. to see him
at least twice a week while he was at the Anderson County Jail before being transferred to the TDC
system. However, once he was in the TDC system, Christi no longer brought J.R.W. to see him. 
Christi acknowledged that she sent Alvin a picture of J.R.W. and a picture that he drew. She denied
attempting to make any contact with Alvin for J.R.W. or taking him to see Alvin at the county jail or
prison. 

 There was extensive and conflicting testimony from Christi, Kathleen, Susan, and Jerry
regarding attempts by Alvin's family to contact J.R.W. and locate his address. Although Kathleen and
Susan saw J.R.W. at chance meetings over the years, both testified that Christi refused to give them
her address or telephone number and ignored requests to see J.R.W. Further, Kathleen testified that
she gave Christi letters from Alvin to J.R.W. at one meeting, but Christi denies she received these
letters. Christi testified that Kathleen never called and requested a visit with J.R.W. If she had, Christi
would have consented. Further, Christi has allowed Kathleen contact with J.R.W. whenever they met. 
Also, Susan testified that she left numerous messages on the answering machines of each "Jerry Pugh"
in the telephone book, requesting visitation with J.R.W. However, Jerry denied receiving any
messages on his answering machine from Alvin or his family.

Evidence that termination is not in the best interest of the child

 James, Kathleen, and Susan all testified that terminating Alvin's parental rights would not be
in the best interest of J.R.W. Additionally, Kathleen testified that Alvin is J.R.W.'s father and that he
should have a right to see his child. Susan testified that Alvin loves J.R.W., has never endangered
him, and, hopefully, will be able to resume that relationship. 

 Although there was conflicting testimony regarding Alvin's parental abilities, the court could
have resolved this conflict in favor of its finding based on Christi's testimony that Alvin was an
absentee father. The court could have disbelieved Alvin's excuse for his lack of communication with
J.R.W. since his incarceration and his contention that he was unable to locate Christi's address. 
Further, a reasonable fact finder could have believed Christi's testimony that Alvin knew her address
or could have found it without difficulty. Moreover, the court could have concluded that Alvin's
letters to J.R.W. were not written monthly as Alvin contended. Consequently, we find that the
disputed evidence was not so significant that a reasonable trier of fact could not have reconciled this
evidence in favor of its finding and formed a firm belief or conviction that termination of Alvin's
parental rights was in J.R.W.'s best interest. Therefore, Appellant's second issue is overruled.


Conclusion

 Based upon our review of the record, we conclude that the trial court did not err in finding that 
terminating Alvin's parental rights was in the best interest of J.R.W. Therefore, the judgment of the
trial court is affirmed.



 SAM GRIFFITH 

 Justice



Opinion delivered April 2, 2003.

Panel consisted of Worthen, C.J., and Griffith, J.



(PUBLISH)
1. According to attachments filed with Appellees' Original and First Amended Petition for Termination and
Adoption of Stepchild, Alvin violated Section 21.11 of the Texas Penal Code, Indecency With a Child. Tex. Pen.
Code Ann. § 21.11 (Vernon 1994). The offenses were second degree felonies with a punishment range of not more
than twenty years or less than two years in the Texas Department of Criminal Justice, Institutional Division, and a
fine not exceeding $10,000. Tex. Pen. Code Ann. § 12.33 (Vernon 1994). According to documents included in the
Clerk's Record, Alvin was sentenced to deferred adjudication probation pursuant to Section 42.12 of the Code of
Criminal Procedure. Tex. Crim. Proc. Code Ann. § 42.12 (Vernon Supp. 2003).
2. While the record is unclear regarding the reason for Alvin's arrest on August 30, 1996, Alvin's jail time
after his arrest was credited to his sentence.
3. According to the court's order, Alvin violated section 161.001(1)(Q) of the Texas Family Code. The
Family Code states that an involuntary termination of the parent-child relationship may be ordered if the court finds
that the parent has "knowingly engaged in criminal conduct that has resulted in the parent's conviction of an offense
and confinement or imprisonment and inability to care for the child for not less than two years from the date of filing
the petition." Tex. Fam. Code Ann. § 161.001(1)(Q) (Vernon 2002).
4. Letters from Alvin to J.R.W. were admitted at trial for the limited purpose of showing that Alvin wrote the
letters, and that they were returned. Forty-six letters were admitted, dated from August 10, 1997 through October 6,
2001. Alvin acknowledged that some of the letters were written and dated after he was served with the petition for
termination when he discovered J.R.W.'s address. However, Alvin specifically testified that letters from August of
1997 through Christmas of 1999 were never received by J.R.W., but were sent to Alvin's mother's address because
he was unable to "make contact" with Christi. The rest of the letters were admitted all together for the prior limited
purposes.
5. Birthday and Christmas cards to J.R.W. were admitted at trial for the limited purpose of showing that the
cards were sent.